# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff. | ) |
| | ) |
| v. | ) Cr. No. 1:21-CR-78 (MN) |
| | ) |
| MELVIN JANVIER III, | ) |
| | ) |
| Defendant. | ) |

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Melvin Janvier, 34 years old at the time of his offense, possessed child pornography on his cell phone, which depicted some of this country's most vulnerable victims – prepubescent children being forced to commit horrific sexual acts. Janvier not only possessed child pornography but also shared it with an undercover officer ("UC"), which was the impetus of the investigation. Amended Presentence Investigation Report ("PSR"), D.I. 53, ¶¶ 16-21. Notably, this is not Janvier's first conviction for this behavior. The defendant was convicted in New Castle County Superior Court for dealing and possessing child pornography in 2015. PSR ¶ 64. In fact, he was on probation for that case at the time of the conduct that brings him before this Court. PSR ¶ 71.

The defendant's anticipated request to the mandatory 120 months does not appropriately reflect the serious of the defendant's crimes, his history and characteristics, nor does it adequately protect the public from further crimes.[1] Thus, the seriousness of defendant's conduct favors a top of guideline sentence of 135

---

[1] The defense has not yet filed its sentencing memorandum, but the government anticipates a request of 120 months based on conversations with defense counsel.

months' imprisonment, followed by twenty-five years of supervised release, which is reasonable and appropriate when considering all the 18 U.S.C. § 3553(a) factors.[2]

## PROCEDURAL AND FACTUAL BACKGROUND

On December 7, 2021, a federal grand jury sitting in the District of Delaware returned an Indictment charging the defendant with distribution of child pornography and possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A), (b)(1), and 18 U.S.C. § 2251A(a)(5)(B), (b)(2). PSR ¶ 1. After Janvier's arrest, the defendant did not contest detention and has remained detained through sentencing. PSR ¶ 2.

On November 20, 2023, Janvier appeared before the Honorable Judge Maryellen Noreika for a Change of Plea hearing. PSR ¶ 3. During the hearing, Janvier changed his plea as to Count Two, possessing child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and entered into a memorandum of plea agreement with the government. PSR ¶¶ 3-13, D.I. 36.

As a part of the recitation of facts at the change of plea hearing and the offense conduct outlined in the PSR, Janvier admitted that in 2021 a Federal Bureau of Investigation ("FBI") Task Force Officer ("TFO") working with the Child Exploitation Task Force as an undercover officer ("UC") entered a private group chat on the "Kik" messenger application. PSR ¶ 16. The UC began a conversation with a Kik user "melv19702", who had a display name of "MelJ". PSR ¶ 17. During a private conversation between the UC and MelJ, where the two were discussing child

---

[2] As always, the government filed a sealed Attachment A along with this sentencing memorandum.

2

pornography videos and child sexual abuse materials ("CSAM"), MelJ told the UC he had served four years in prison for child pornography and was currently on probation. PSR ¶¶ 17-18. MelJ said his underlying case stemmed from being caught on the same platform, Kik. PSR ¶ 18. MelJ further stated he had a burner phone that his probation officer was unaware of, specifically stating "[h]e don't know I got this one…lol gotta love burners." PSR ¶ 18.

On July 12, 2021, MelJ sent the UC four videos depicting CSAM via Kik and then on July 13, 2021, MelJ sent one image of CSAM via text message to the UC. PSR ¶ 19.[3]

On July 20, 2021, MelJ sent the UC a weblink via text message. The UC clicked the link and observed approximately 600 files containing depicting CSAM. The link was no longer valid two days later when the UC tried to extract the data for the investigation. PSR ¶ 21.

Subsequently, the FBI determined that subscriber information for "melv19702" was associated to a Gmail address attributed to Janvier, and an address in Newark, Delaware. PSR ¶ 22. Further, a sex offender registry showed that Melvin Janvier III was a registered sex offender in Delaware and a photograph of the defendant was like the photo associated with the Melv19702 Kik account. *Id*.

In light of Janvier's interactions with the UC on Kik and subscriber information, officers from the State of Delaware Probation and Parole conducted a search of Janvier's residence. PSR ¶ 24. When asked if he had any devices capable

---

[3] The four video files are described in PSR ¶ 20 and in aggregate were about two minutes and fifteen seconds.

of connecting to the internet, Janvier stated he possessed a Samsung Galaxy AO1 smartphone (s/n R9PN50WH28J). PSR ¶ 24. Janvier provided the passcode for the device to probation and the probation officer observed the chat conversation between Janvier (MelJ) and the UC on Kik. PSR ¶ 25. The probation officer also observed a CSAM image that matched what MelJ sent to the UC. *Id*. Janvier admitted to having the phone for viewing child pornography and that he had the phone for less than a year and had been viewing child pornography for only a few months. *Id*. Janvier was arrested and the device was ultimately transferred to FBI custody and searched. *Id*.

A full forensic examination of the Samsung smartphone referenced above revealed the existence of CSAM. PSR ¶ 26. In total, over 2000 CSAM files were recovered from the device. *Id*. Over the course of the investigation, and in preparation for sentencing, the government completed a report that removed duplicate images and videos for a final count from the device. *Id*. This report indicated 12 images and 79 videos in allocated space.[4] Many of the recovered images depicted prepubescent, bondage, bestiality and known victims. *Id.*

## THE UNITED STATES' SENTENCING RECOMMENDATION

## INTRODUCTION

As a preliminary matter, the government agrees with the PSR's calculation. Based upon a total offense level of 30 and a Criminal History Category of II, intertwined with the statutorily required mandatory minimum sentence of 10 years'

---

[4] At the time of filing, PSR ¶ 26 indicates 2 images and 90 videos. The correct count is listed above, and this update was provided to probation and defense counsel via email on January 8, 2025.

incarceration, the correct guideline range is 120 months to 135 months of imprisonment. PSR ¶ 133.

## DEFENSE OBJECTIONS TO THE PSR

As the Court is aware, the defense filed objections to the PSR. PSR at pp. 34-42. As outlined in a letter to the Court ahead of sentencing, D.I. 56, all but two of the objections have been resolved between the parties and are moot. The two outstanding objections are 1) the inclusion of the defendant's conduct while at the Bureau of Prisons (BOP) and 2) whether the specific offense characteristic involving the use of a computer applies, under U.S.S.G. § 2G2.2(b)(6). The government addresses these two objections below.

### A. Bureau of Prisons Conduct

Pursuant to 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense, which a Court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See*, *Witte v. United States*, 515 U.S. 389, 397-401 (1995) (noting that sentencing courts have traditionally considered a wide range of information without the procedural protections of a criminal trial, including information concerning uncharged criminal conduct, in sentencing a defendant within the range authorized by statute).

A BOP investigation into improper use of tablet devices within the BOP to obtain illicit or explicit materials, a violation of BOP procedures, found the defendant was involved in attempting to obtain erotic stories while incarcerated. While the

investigation found the defendant did not possess CSAM, the findings of the BOP investigation were provided to government counsel ahead of sentencing. Once the undersigned received this information, it was turned over to both the defense and United States Probation pursuant to discovery and ethical obligations.

To the extent the defense contends the information from the Bureau of Prisons is unreliable, the government disagrees as the BOP records are sufficiently reliable as to accuracy and permissible hearsay. *See*, U.S.S.G. § 6A1.3; *Witte*, 515 U.S. at 399-401. The government finds this information relevant to the Court ahead of sentencing as it demonstrates the defendant's continued use of computers and technology to obtain sexually fueled materials, and more importantly, shows that the defendant did not follow the rules within the BOP while pending sentencing. Ultimately, this conduct is a basis for the Court to impose an extended period of supervised release upon the defendant's release from custody.

### B. Use of a Computer under U.S.S.G. § 2G2.2(b)(6)

As outlined in the government's response to defendant's PSR objections, U.S.S.G. § 2G2.2(b)(6) states if the offense involves a "computer" for the possession, transmission, receipt, or distribution of CSAM material, a two-level increase is appropriate. A computer is defined under 18 U.S.C. § 1030(e)(1) (Computer Fraud and Abuse Act or "CFAA"). A computer means "an electronic, magnetic, optical…or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly to it or operating in conjunction with such device." Finally, a cellphone is a

6

"computer" under the CFAA. *See, United States v. Kramer*, 631 F.3d 900 (8th Cir. 2011); *see also, United States v. Carmichael*, 2023 WL 2758350 (3d Cir. 2023) (District Court holding that a SIM card containing child pornography qualified for the two-level enhancement under U.S.S.G. § 2G2.2(b)(6)).

Here, the defendant utilized a cellphone as a storage facility for his CSAM which falls squarely under the definition of a computer under 18 U.S.C. § 1030(e)(1). Further, he used the device to send and transmit CSAM to the UC, in which the smartphone acted as a communications facility to send CSAM to another device. Therefore, the two-level enhancement is appropriate and should be applied.

## 18 U.S.C. § 3553(a) FACTORS[5]

The Court must consider several statutory factors when sentencing any defendant. *See,* 18 U.S.C. § 3553(a). In this case, the government submits that a sentence at the top of the guideline range, 135 months of incarceration, appropriately balances the seriousness of defendant's conduct while considering his criminal history, personal circumstances, and acceptance of responsibility. The government addresses these factors below.

### A. Nature and Circumstances of the Offense

The defendant utilized a "burner" phone and bragged to an undercover officer about hiding the phone from probation and using it to possess and distribute CSAM. PSR ¶¶ 16-18. He did so all while on probation, not just for the same conduct but for utilizing the same platform as the instant offense. PSR ¶¶ 18, 71. In the digital era,

---

[5] In order to stay consistent with the sentencing process, the government notes there are no motions for a departure or variance.

when a cellphone is essentially a laptop in one's hand that can be possessed and accessed by just about everyone – the dangers are endless. CSAM and illicit content can be accessed with just one click, in one millisecond, under disguise, with no one knowing about it. This type of access is of the utmost concern because it allows society, specifically the defendant, to access and share his criminal activity with the push of a button to someone who is half a world away. Further, as technology advances, such as with encryption tools and hidden folders, today's digital devices allow for consumers and producers to hide their CSAM in plain sight.

This case is a prime example of the danger associated with digital devices. The defendant chatted with an undercover officer, who he believed to be hundreds of miles away, and the defendant believed the two were swapping images of children with the push of a button. They discussed CSAM videos and disturbing details of what such videos depicted. This exemplifies the danger. The defendant, while on probation for this conduct, could communicate with ease about CSAM and the same material that got him in trouble the first time. This ability to create a connection with a stranger located states away at moment's notice fuels consumers of CSAM's hunger for more. It fuels the distribution of CSAM, such as that by the defendant, before even looking at the amount of CSAM on his device. In total, over 2000 images were found, including 90 videos. This amount of CSAM, in connection with his probationary status, demonstrates the defendant's inability or unwillingness to commit to rehabilitation and reform.

Given the defendant's conduct and his criminal history, he could have faced a

15-year mandatory minimum for distribution of CSAM. PSR ¶¶ 1 (noting defendant was charged with distribution of child pornography); 64-67 (discussing defendant's prior conviction for felony dealing in child pornography and possession of child pornography); 18 U.S.C. § 2252A(b)(1) (imposing 15-year mandatory minimum for defendants who distribute child pornography with a prior child exploitation conviction). While the defendant pled guilty to possession of child pornography, and faces a 10-year mandatory minimum, the fact that he also distributed child pornography counsels in favor of a higher sentence. A top-of-guideline sentence of 135 months sits between the two mandatory minimums he could have faced for his conduct. As such, it both reflects the seriousness of his conduct and accounts for his acceptance of responsibility. Simply put, there is no basis for the defendant to get a bottom of the guideline sentence when looking at the nature and circumstances of this case.

### B. History and Characteristics

This is the defendant's second felony conviction for possession of child pornography. PSR ¶¶ 64-76. Janvier's first child pornography conviction occurred in 2015, when he was 27. PSR ¶ 64. The facts surrounding that arrest are incredibly comparable to the instant case: both involved utilizing Kik, cell phone devices, and admissions to law enforcement. PSR ¶¶ 65-66. This time, Janvier lived across the street from his parents with friends instead of in their basement. PSR ¶ 65. Now, he stands before the Court at the age of 37, after having committed the crime at the age of 34, while on supervision for committing the same crime when he was 27.

The government anticipates that Janvier will request the Court impose the mandatory minimum based on Janvier's history and characteristics as outlined in the PSR. The defendant's history and characteristics do not weigh in favor of a bottom of the guideline, or mandatory minimum, sentence.

The defendant's crimes were not ones of carelessness. The defendant knowingly sought out horrific material for his own sexual gratification – while on probation for the same conduct. He discussed this dreadful material openly and shared those images with others, namely an undercover officer. He did not stumble upon child pornography. He sought it out. He built a collection. He shared that collection. The defendant's history as a recidivist and his personal characteristics are commensurate with a top of guideline sentence.

### C. The Seriousness of the Defendant's Offenses, Promotion of Respect for the Law, and a Just Punishment

"The demand for child pornography harms children in part because it drives production, which involves child abuse. The harms caused by child pornography, however, are still more extensive because child pornography is 'a permanent record' of the depicted child's abuse, and 'the harm to the child is exacerbated by [its] circulation.'" *Paroline v. United States*, 572 U.S. 434, 439–40 (2014) (alteration in original).

A lengthy sentence is necessary to protect the public from the defendant. The defendant sought out images of the most vulnerable - children. Internet access provided him with the opportunity to engage in sexually explicit conversations with, and request pornographic materials from, others who shared the desire to view

sexually explicit images of the youngest of children.

This conduct is reprehensible. There are few offenses more serious than those involving CSAM, which depicts children who cannot protect themselves. Those victimized in the production of CSAM are forced to live difficult and challenging lives, as outlined in the restitution requests associated with this case.[6] While the defendant did not produce CSAM, his urge and desire to possess and distribute CSAM fuels the black-market consumption of the material. His sharing of CSAM just further highlights the domino effect of the CSAM market and the seriousness of his offenses.

While the government believes and agrees that the defendant should receive treatment to attempt and reduce the defendant's risk of recidivism, it does not outweigh the need to protect the public from the defendant, in particular, children residing in Delaware.

D.      **Adequate Deterrence and Respect for the Law**

Previous incarceration, for the same conduct, did not appear to deter the defendant. As such, a substantial period of incarceration is needed to provide adequate deterrence to the defendant. A sentence to the mandatory minimum is a lengthy sentence, but this Court should send a message not only to the defendant but to other similarly situated convicted CSAM felons – recidivism with these types of offenses is unacceptable and leads to top of guideline sentences.

Therefore, the recommended sentence is not just appropriate, but necessary to

---

[6] The full documentation of restitution, including victim-impact statements, was provided to the Court by way of United States Probation to protect the victims. However, the restitution request is outlined in PSR ¶¶ 27-44, 145-154.

11

promote respect for the law. Further, it serves as both a personal and general deterrent.

## RESTITUTION

Under 18 U.S.C. § 2259(a), restitution to child pornography victims is mandatory. A defendant must be ordered to pay "the full amount of the victim's losses," which may include "any costs incurred by the victim" for: medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorneys' fees, as well as other costs incurred; and any other losses suffered by the victim as a proximate result of the offense. *See,* 18 U.S.C. § 2259(b)(1) and (3).

A court may not decline to order restitution because of "the economic circumstances of the defendant" or "the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source." *See,* 18 U.S.C. § 2259(b)(4).

The Supreme Court held that "[r]estitution is . . . proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses." *Paroline,* 134 S. Ct. at 1722. In *Paroline*, the petitioner pleaded guilty to possessing child pornography, which included images of victim "Amy," who was sexually abused as a child. *Id.* at 1717.

There, the Supreme Court recognized:

The knowledge that her images were circulated far and wide renewed the victim's trauma and made it difficult for her to recover from her abuse." *Id.*

12

> Akin to the suffering of many child victims, the crimes of Amy's abuser "were compounded by the distribution of images of her abuser's horrific acts, which meant the wrongs inflicted upon her were in effect repeated; for she knew her humiliation and hurt were and would be renewed into the future as an ever-increasing number of wrongdoers witnessed the crimes committed against her. *Id*.

Amy sought restitution from defendant Paroline for lost income, future treatment, and attorney's fees and costs, conceding that her losses did not flow from specific knowledge of defendant Paroline's identity or specific conduct. *Id*. at 1718. The *Paroline* court agreed that 18 U.S.C. § 2259 requires proximate cause for all the statute's loss categories. *Id*. at 1722, 1730-31, 1735-36. They further recognized the pervasive problems caused by the trafficking of child pornography:

> The demand for child pornography harms children in part because it drives production, which involves child abuse. The harms caused by child pornography, however, are still more extensive because child pornography is "a permanent record" of the depicted child's abuse, and "the harm to the child is exacerbated by [its] circulation." *Id*. at 1716-17 (quoting *New York v. Ferber*, 458 U.S. 747, 759 (1982)).

Adopting an aggregate-causation theory based on tort law, the *Paroline* court held that when multiple causes combine to produce an event and no cause is necessary or sufficient, each cause can be said to be one cause-in-fact of the event. *Id*. at 1725-27. In other words, defendant Paroline's criminal conduct contributed to the continuing harm suffered by the victim, and although "it is not possible to identify a discrete, readily definable incremental loss he caused, it is undisputable that he was part of the overall phenomenon that caused her general losses." *Id*. at 1726.

The Supreme Court then addressed how to calculate restitution in cases where "a defendant possessed a victim's images and that . . . victim has outstanding losses

13

caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant." *Id.* at 1727.

The Court concluded that defendants like Paroline, and the defendant here, should be required to pay "restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses," and that the amount should be determined by the district court in the exercise of its discretion. *Id.* at 1727-28.

Under such a framework, restitution orders "serve the twin goals of helping the victim achieve eventual restitution . . . and impressing upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.* at 1727. *Paroline* emphasized that there is no "precise mathematical inquiry" governing this determination, and that district courts must exercise "discretion and sound judgment" in fashioning awards. *Id.* at 1727-28.

To that end, courts should consider a variety of factors, including the number of defendants caught, likely to be caught, and existing in the world; whether the defendant produced or distributed the images; how many images he possessed; and "other facts relevant to the defendant's relative causal role." *Id.* at 1728. Using these "rough guideposts," district courts should determine restitution orders that are not "severe" but also not "trivial . . . token or nominal." *Id.* at 1727-28.

In this case, law enforcement found images from 15 identified victims of numerous known series of child pornography on the defendant's device. PSR ¶¶ 27-44, 145-154. Each victim has incurred, and will continue to incur, losses as a result

14

of the production of their CSAM images. They have presented loss amounts as reflected in the PSR. PSR ¶ 149. The government agrees with probation's assessment of restitution and requests that this Court order $3,000 of restitution for each victim, generating a total restitution amount of $45,000 as detailed in PSR ¶¶ 145-153.

The amount of each victim's loss is complicated as it includes necessary life-long counseling, lost wages, and attorney's fees. $3,000 per victim is a reasonable figure that balances the goals of helping each victim and impressing upon offenders the fact that their actions affect real victims. It also accounts for the defendant's relative role in causing their harm, as one of many who viewed their images and shared them with others. Anything less would be a "trivial," "token," or "nominal" payment. Further, $3,000 is not too "severe" a punishment, as it is the binding minimum in child pornography cases pursuant to § 2259(b)(2)(B).

* * * * * * * *

## CONCLUSION

In sum, the government submits that a custodial sentence of 135 months' incarceration, followed by twenty-five years of supervised release, is sufficient but not greater than necessary to accomplish the goals of sentencing.

Respectfully submitted,

DAVID C. WEISS
United States Attorney

By: *Samuel S. Frey*
Samuel S. Frey
Assistant United States Attorney

Dated:  January 15, 2024